## Columbian Fuel Corporation v. Skidmore.

November 5, 1948.

448

Hobson & Scott for appellant.

P. B. Stratton for appellee.

OPINION OF THE COURT BY STANLEY, COMMISSIONER—
Affirming in part, reversing in part.

By a parol contract the Columbian Fuel Corporation employed H. L. Skidmore to drill a gas well for $2.40 per foot. This was the extent of the express contract. Skidmore had previously drilled a number of wells for the corporation, and it may be assumed that the parties understood the necessary details. It is not controverted that the contract was for a completed well, as might be determined by the company. Nor is the legal implication of reasonable skill and care and proper workmanship questioned. The evidence shows that it was understood if the driller failed through his own fault to drill to a point where gas was found, it would be his duty to skid his outfit to another location and drill a new well at his own expense.

When a depth of 1,984 feet had been reached, the tools became fastened because of cave-ins. The driller struggled for three weeks to extricate them. An effort to "drill by" also failed. Not only were the efforts to loosen the drilling tools unavailing, but some of the fishing tools became fastened. Finally, Skidmore prepared to use an explosive, which is simply called "gelatine," to shoot the well for the purpose of loosening the tools that he might continue the drilling. The method to be employed is fully described in the record and seems to be well known in the business. Learning of Skidmore's preparation, the officers of the company sent a subordinate employee to the well to direct him not to shoot it. Construing the message and other acts of the company's agent as a wrongful interference with the drilling, and as taking over the job, Skidmore abandoned the contract. He filed this suit to recover damages for its breach, compensation for use of his drilling rig, damage to an engine and the value of his lost tools. He claimed $4,641.60 for work done, being at the contract price of $2.40 a foot for 1,934 feet, and stated sums for the other items.

The defendant denied its breach, and charged that the plaintiff broke the contract by deliberately and wrongfully abandoning the job. It counterclaimed for certain damages and expenses incurred in removing the casing, and for loss of part of it not recovered. It also sought recovery of the difference of 35 cents a foot that it was required to pay another contractor for drilling another well to a depth of 3,115 feet.

The court transferred the action to the equity docket on the defendant's motion because of the complicated accounts and details. The judgment is in favor of the plaintiff for the amount claimed for drilling, $4,641.60; for damages to his engine, $250; and for the loss of drilling tools, $643.06. The court disallowed an award of $750 reported by the master commissioner for the use of the plaintiff's machinery, and dismissed the counterclaim.

The point on which the case turns is which party violated the contract. Other issues are subordinate.

The technical and expert evidence as to the propriety of shooting the well in order to extricate the tools is conflicting. Skidmore had twenty-five years' experience in drilling oil and gas wells. His proposed action was a customary method, he and others testified. It was to be taken in reliance not only upon his own judgment but that of other experienced drillers whom he consulted. The company's officers thought that discharging the explosive would do no good and might injuriously affect the production of other wells on the lease. It may be that under such circumstances and in the absence of definite contractual limitations, the driller has the right to exercise his judgment where the only contract is to drill a well, becoming responsible to the other party for resulting damage to his property. It is of significance that afterward, Williamson, the general field representative of the company, tried to get Skidmore to go back, telling him he could shoot the well or do what he pleased with it. But in the present case, the decision of the trial court in favor of the driller is regarded as a finding of fact on the issue. It is entitled to the same consideration as a verdict of a jury properly instructed on the question of whether it was a proper or an improper course to take.

We summarize the other evidence. Van Patton, the company's general superintendent, instructed Crum, a field superintendent, either to go himself or send someone to tell Skidmore not to shoot the tools off or put in a shot at that depth, as it would ruin the hole, and for him to start a new well. Crum sent Carney, a subordinate employe. This message, the company's officials say in evidence, was the equivalent of a positive order.

Before going Carney told Crum that Skidmore would quit and leave, for he had heard him say that morning he would do so if the company interfered. Crum replied that he did not want the workmen to go. Carney testified he instructed him to ask them to stay on the job; but Crum denied having told Carney to hire the drillers. Skidmore's wife also warned one of the field superintendents that would be the result of interference.

Carney delivered the message to Skidmore, and told him if he could not clean the well out without shooting the well, the company would take it over. He responded that he "would turn it over to them and let them have it." Carney asked if he would leave the four men there and Skidmore replied they would be working for the company; also, that he would expect $50 a day for the use of his rig. Carney's testimony is: "I told Skidmore the company did not want the well shot, and he said he was going to quit. So, I went on, and we talked around there, and he told the men to gather up their stuff and get ready to go in, he had quit. When he told them that, I told him that Mr. Crum wanted the men to stay in there, and he asked them if they wanted to stay and work for the company according to what Mr. Crum told me, that he wanted the men to stay in there. I thought he wanted them to work for the company; and Mr. Skidmore told me they had to have a stem and a bailer and told me where to get them, and I took the truck and hauled them and some rock."

Skidmore's evidence is more specific. Three of the workmen testified to like effect. So there is really no material difference in the evidence as to what occurred at the time.

Crum had instructed Carney to get certain tools and some crushed rock and take to the well for use in the process of getting out the drilling tools. He did that after Skidmore left and reported it to Crum that night, though it does not appear he then reported to Crum that Skidmore had abandoned the job. The men continued their efforts to loosen the tools for about a week, and then damaged the gas engine so it could not be used without extensive repair. It was then, according to the company's operating officers, they learned that

Skidmore had abandoned the job. When he refused to undertake it again, the company pulled out as much of its casing as it could, and had a well drilled by another contractor.

The appellant denies Carney had any authority to take over the well or that it ratified his action. Carney was a general handy-man, collecting the daily reports of the various wells, carrying messages, etc. It is true he had no general authority under which he could take over the contract, but it is a fair conclusion that the officers who had that authority, particularly the field superintendent, Crum, did in fact authorize him to keep the men on the job in case Skidmore quit. Afterward they received daily reports of progress signed by others than Skidmore, and it seems, paid the wages of the workmen. As in the matter of the propriety of shooting the well, so too on this issue of authorization and ratification we accept the finding of fact by the court that the company repudiated the contract and took over the job.

The company takes the position that there was a breach of the contract by Skidmore. Its point is thus stated: "The contractor having failed to complete the well, he is not entitled to the contract price and is entitled to nothing more than the reasonable worth to the proprietor of the work done. In this case, nothing."

Completing the well involved hazards and risks, including the loss of tools, and such risks and responsibilities were assumed by the driller. Cf. Phelps v. Horner, 199 Ky. 589, 251 S. W. 666. He not only had the right but the duty of extricating the tools if he could, or, if not, of drilling another well. Otherwise he would have breached the contract and suffered the consequences. And if he had damaged other property of the company by shooting this well, he would have been liable. 24 Am. Jur., Gas and Oil, sec. 113; Corbin Oil & Gas Co. v. Mull, 123 Ky. 763, 97 S. W. 385. There was an implied promise or undertaking by the company that it would do nothing which would hinder or obstruct Skidmore in the performance of his contract. When that promise was broken, it constituted a breach and repudiation of the contract, and relieved the other party of his commitment to complete the well. He had the right and option to accept the situation created by the wrongdoing of the

other party and refuse to proceed further. Cadillac Oil & Gas Co. v. Robert Lovelace & Co., 198 Ky. 267, 248 S. W. 883; Texas Granite Oil Co. v. Williams, 199 Ky. 146, 250. S. W. 818; Summers, Oil & Gas, sec. 686; 12 Am. Jur., Contracts, secs. 386, 389.

The decision of the trial court on the facts was, necessarily, that the company had without legal cause stopped Skidmore from proceeding with the performance of his contract.

Where a driller of an oil or gas well, through no fault of his own, is prevented by the other contracting party from completing it, that party may not assume that the driller will be unable to complete his contract, and thereby deprive him of the right to do so and prevent him from recovering for the value of services performed under the terms of the contract. Thornton, Oil & Gas, (5th Ed.) sec. 700; Summers, Oil & Gas, sec. 688; Elwood Oil & Gas Co. v. McCoy, 72 Okl. 97, 179 P. 2; Holiday Oil Co. v. Smith, 100 Okl. 172, 228 P. 775. "If, after the owner orders drilling stopped, he takes charge of the well and damages it so that drilling cannot be continued, the driller is entitled to his compensation." Summers, sec. 685; Miller v. Brosius, 113 Kan. 652, 216 P. 294.

But the appellant argues that the contract was an entire contract, and was broken because the well was not completed; hence, that the driller can recover no part of the contract price for the work he abandoned. The contract was unquestionaly entire and indivisible in respect to performance. But the consideration of damages is based on its breach by the company. Where the owner repudiates a contract to drill a well, thereby preventing the driller from completing it according to the contract, it becomes severable as to both parties, and the facts present two elements of damage: one for the finished part of the work and one for the unfinished part. Marland Refining Co. v. Dunigan, 104 Okl. 194, 230 P. 869.

Upon the breach of a contract by one party, the other may by election rescind and recover the value of any performance rendered, or stand by the contract and recover damages sustained by its breach as if he had performed. 17 C. J. S., Contracts, secs. 422, 424,

454

469; 9 Am. Jur., Building and Construction Contracts, sec. 45; 12 Am. Jur., Contracts, secs. 346, 388; Summers, Oil & Gas, sec. 688; Runyan v. Punxsutawney Drilling & Contracting Co., Ky., 102 S. W. 854, 31 Ky. Law Rep. 588; Johnson v. Tackitt, 173 Ky. 406; 191 S. W. 117; Hoefflin v. Wilkerson, 184 Ky. 484, 210 S. W. 667; Texas Granite Oil Co. v. Williams, 199 Ky. 146, 250 S. W. 818; Fyffe v. Skaggs, 246 Ky. 5, 54 S. W. 2d 369; Osage Oil & Refining Co. v. Lee Farm Oil Co., Texas Civ. App., 230 S. W. 518.

If the contractor waives damages for the unfinished part of the work and sues for the finished part, as the plaintiff did here, the measure of damages is the price per foot as fixed in the contract. Letcher v. Maloney, 70 Okl. 65, 172 P. 972; Elwood Oil & Gas Co. v. McCoy, 72 Okl. 97, 179 P. 2; Holiday Oil Co. v. Smith, 100 Okl. 172, 288 P. 775; Marland Refining Co. v. Dunigan, 104 Okl. 194, 230 P. 869. That is what the court properly adjudged.

While the workmen were continuing their efforts to get out the tools after Skidmore abandoned the job, they negligently damaged his engine so it would not work. It follows, of course, that if the men were working for the company, it is responsible for that damage, which the court found to be $250. The denial of compensation for the use of Skidmore's rig is not before us since there is no cross appeal.

We are of opinion, however, that the plaintiff did not establish a legal right to recover for the loss of his tools which had stuck in the well. The company contends that Skidmore and his hands were responsible for their becoming fastened through failure to exercise proper skill to prevent the cave-ins or the debris falling on and around the drilling tools. Whether there was negligence or not, this was a hazard, as above stated, assumed by the drilling contractor. It is purely speculative that what the workmen did as employes of the company proximately prevented their recovery. They were lost before that time. It seems also that had they been extricated after being loosened by the explosive, part, if not all, of the tools would have been of little value. A driller will not be permitted to recover damages purely speculative in nature. Summers, Oil &

Gas, sec. 688; New Domain Oil & Gas Co. v. Feeley & Dimick, Ky., 107 S. W. 1185, 32 Ky. Law Rep. 1181.

The judgment is affirmed except that part which awards damages for the value of the lost tools. To that extent it is reversed.