Walter B. SMITH et al., Appellants,

v.

R. O. TIPTON et al., Appellees.

Court of Appeals of Kentucky.

March 25, 1955.

Rehearing Denied Dec. 16, 1955.

Walter B. Smith, Louisville, for appellants.

John W. Coomes, New Castle, for appellees.

CULLEN, Commissioner.

In an action growing out of the alleged breach of a crop-raising contract, R. O. Tipton and his son Richard, whom we will call the tenants, recovered judgment upon a jury verdict in the amount of $6,500 against the landlords, Mr. and Mrs. Walter B. Smith. The recovery was for the value of the Tiptons' share of a tobacco crop and a corn crop, plus some minor items of damage. The basis for the recovery was that the Smiths had prevented the Tiptons from stripping and marketing the tobacco and from harvesting the corn. The Smiths have appealed from the judgment.

The Tiptons and the Smiths entered into a written contract on March 1, 1950, under which the Tiptons were to raise 11¾ acres of tobacco on the Smiths' farm in Shelby County, Kentucky. It was a typical share-cropping arrangement, under which the Smiths were to furnish the land and the Tiptons the labor, each party was to pay half the cost of fertilizer, canvas and coke, and each party was to receive half of the sale price of the crop. Although not specifically expressed in the written contract, the Tiptons' obligations included the duty of stripping all the tobacco and preparing it for market. The Tiptons were not to occupy the entire farm, but merely to cultivate the tobacco land.

By a subsequent oral agreement, the acreage of tobacco to be raised on the Shelby County farm was increased to 17.8 acres, and it was agreed that the Tiptons also would raise nine-tenths of an acre of tobacco on a farm owned by the Smiths in Indiana. It was further agreed that the Tiptons would raise 76 acres of corn, 35 of which would be on the Shelby County farm and the remainder on the Indiana land. The additional tobacco and the corn were to be raised under a 50–50 share-cropping arrangement, similar to that provided for in the original written contract.

The Tiptons proceeded to plant all of the crops agreed upon, except that they planted only 16.8 acres of tobacco on the Shelby County farm, instead of the 17.8 acres agreed upon. However, no question was raised at the time about the shortage of one acre, nor was any question raised as to the time of planting, although the Smiths now contend that half of the corn was not planted soon enough to mature before frost.

Early in October there was a controversy between Mrs. Smith and R. O. Tipton concerning the harvesting of the corn in Indiana, arising out of Mrs. Smith's belief that Tipton was taking more than his share of the corn. However, nothing definite resulted from this controversy.

On November 5, a controversy arose between Mrs. Smith and R. O. Tipton with respect to the method being employed by Tipton in stripping the tobacco on the Shelby County farm. Tipton was rehanging the tobacco, or "tier bulking" it, after stripping. Mrs. Smith insisted that the tobacco should be pressed and bulked down in the stick, and covered with a carpet. Although denied by Mrs. Smith, there is evidence that she ordered Tipton to take his truck and get off the farm, and to stay off all the Smith farms.

Following the controversy on November 5, Tipton consulted an attorney named Matthews, in Shelbyville, and the Smiths endeavored to employ an attorney named Saunders. The latter refused to accept employment as an attorney, but agreed to act as a go-between in an effort to work out the difficulties between the parties. On the morning of November 16, Tipton and Saunders met with Matthews in the latter's office, and it was agreed that Tipton would go with Saunders to the Shelby County farm and endeavor to work out a division of the tobacco with the Smiths. Accordingly, they went to the farm, accompanied by a friend of Tipton's. They then went through the barns, with the Smiths, and Saunders marked off a division of the tobacco in each barn. Tipton was offered his choice of the division in each barn, but said in effect that it made no difference to him. Throughout the process of dividing the tobacco Tipton took the part of a reluctant, passive participant, he having stated at the first barn that "I haven't agreed to anything."

During the course of the division, the Smiths offered to Tipton his choice of the stripping rooms on the farm. It was made clear that following the division the Smiths would assume the cost of stripping their half of the tobacco, the only condition being that they would be relieved of paying half of the cost of the fertilizer, which, according to Tipton, amounted to $337. No objection was made by Tipton as to the fairness of the division made by Saunders.

Immediately after the division was completed, Tipton left the farm and consulted an attorney named Coomes, in New Castle. That same day, November 16, Coomes wrote a letter to the Smiths, as follows:

"Dear Mr. and Mrs. Smith:

"Mr. R. O. Tipton has employed me to represent him regarding difficulties arising out of his tenant contract with you.

"I have advised him that it is his obligation and duty to strip the tobacco. He desires to do so with your permission.

"Therefore, please notify me in writing that it is all right for Mr. Tipton to come back on the place and strip the tobacco and finish gathering the corn.

"Of course, if you keep him from fulfilling his obligations under the contract, he will be forced to hold you responsible for his one-half of the tobacco crop and the balance of his corn. Expecting to receive your consent within three days for Mr. Tipton to resume his duties insofar as they pertain to the corn and tobacco, I am,
"Yours very truly,
"John W. Coomes"

Two days later, on November 18, Tipton brought to the Shelby County farm a group of six workers. He took them to one of the stripping rooms and then he left the farm. The workers commenced removing tobacco from the barns, for stripping, without regard to the purported division of November 16. Mrs. Smith and a group of her employes, including two armed industrial policemen, then came into the stripping room and engaged in a discussion with Tipton's workers. While there is considerable conflict in the testimony as to what was said, it is reasonably clear that Mrs. Smith was insisting only that the division be recognized, and that the workers not strip any tobacco except that apportioned to the Tiptons. She did not order the workers to leave the farm, but they refused to accept her offer to point out the Tiptons' share of the tobacco, and they proceeded to leave the farm.

On November 22, Mr. Coomes addressed another letter to the Smiths, as follows:

"Dear Mr. and Mrs. Smith:

"Mr. R. O. Tipton informs me that some people employed by him to strip his tobacco crop were forced off your farm by armed employees and agents of yours. As his attorney, I am hereby notifying you that he is looking to you for the value of the crop plus the balance of his corn now on your farm. As he has made an effort to strip the tobacco and has been prevented by you, through your agents, from so doing, the stripping of the tobacco and placing it on the market is now your obligation. In the future, when he is more able to actually determine the value of the crop, I shall let you hear from me.

"Do you have any objections to Mr. Tipton's sending after his tractor equipment consisting of a breaking plow, disk harrow, mower and cultivator? He says he also has some coke there. If he may send after these things, and be permitted to get them peacefully, please let me know.
"Yours very truly,
"John W. Coomes"

On December 8, Mr. Smith wrote Mr. Coomes in response to the above letter. After giving in detail the Smiths' version of the controversy, and stating their insistence upon observing the division of November 16, he announced that the Tiptons were privileged at any time to come upon the farm and strip and prepare their half of the tobacco. Later, in letters of January 4 and February 21, Mr. Smith again disclaimed any interest in the Tiptons' share of the tobacco, and repeated that there was no objection to the Tiptons' coming upon the farm and handling their tobacco.

There were no answers to the letters of Mr. Smith, and the Tiptons never returned to the farm after November 18. Eventually, the Smiths arranged to have the Tiptons' share of the tobacco stripped, taken to a warehouse, redried and stored. There was evidence that at the time of the trial this tobacco had a value of around $4,000,

subject to storage charges. The cost of stripping and handling this tobacco was around $900. The Smiths tendered to the Tiptons the warehouse receipts for the tobacco, upon payment of the stripping and handling costs, but the tender was rejected.

About half of the corn on the several farms was harvested by the Tiptons before the tobacco controversy came to a head. The remainder was never harvested.

In this action for damages the Tiptons sought recovery for the value of half the tobacco crop, on the basis of a yield of 1,500 pounds per acre and a sale price of 58 cents per pound. They also sought the value of half of 30 acres of corn, on the basis of a yield of 45 bushels per acre and a sale price of $1.80 per bushel. Including some miscellaneous items for fertilizer, coke, and truck hire, they asked for approximately $9,600 in damages. The jury awarded $6,500, without itemization. Obviously, the major portion of this award represented damages for the tobacco.

█ We are unable to find any basis for the award of damages for the tobacco. The record shows conclusively that the Smiths were at all times willing for the Tiptons to strip and market one-half the tobacco, using the Smiths' stripping room and barns, and the Smiths were ready to assume the duty, and the expense, of stripping the other one-half. Under these circumstances, even if we assume a technical breach of contract on the part of the Smiths in demanding a division of the tobacco, no detriment to the Tiptons could have resulted therefrom. The only effect of the division of the tobacco could be to relieve the Tiptons of their contractual obligation to strip *all* of the tobacco. It could not in any way reduce the compensation or profits the Tiptons were entitled to expect from their contract; on the contrary, it would increase their profits by relieving them of the cost of stripping the Smiths' share.

The Tiptons rely upon Columbian Fuel Corporation v. Skidmore, 308 Ky. 447, 214 S.W.2d 761, which involved a breach of a well-drilling contract. However, that case is authority only for the proposition that a party who has been prevented from performing his contract by reason of the acts of the other party may recover the compensation that he would have been entitled to had he been permitted to perform. Here, if the Smiths had permitted the Tiptons to complete the performance of their contract, the Tiptons could have received no more compensation—they could only have incurred additional expense.

It is our opinion that the alleged breach of contract by the Smiths, in demanding a division of the tobacco, did not entitle the Tiptons to abandon their share of the crop and look to the Smiths for damages. Accordingly, the Tiptons should have been limited in their recovery to the actual proceeds of sale of their share of the Indiana tobacco, and the warehouse receipts for their share of the Shelby County tobacco, less the expenses incurred by the Smiths in preparing it for marketing.

█ As concerns the corn, two conclusions are possible from the evidence. One is that the Tiptons refused to harvest the balance of the corn because of their insistence that the contract had been broken with respect to the tobacco. The other is that the Smiths, independently of the tobacco dispute, prevented or placed obstacles in the way of harvesting the corn. Upon another trial the instructions should not permit recovery of damages for the corn except upon the second ground above mentioned.

We think the evidence offered by the Tiptons concerning the value of the corn was competent, and that all of the evidence on the subject created a jury issue as to whether the corn was planted so late as to be of no value.

The evidence also created jury issues with respect to who owed whom for canvas, coke and fertilizer, and with respect to a charge for the use of the Tiptons' truck.

Various counterclaims asserted by the Smiths, concerning a shortage of the tobacco acreage, abuse of the gates and fences by the Tiptons, and the failure of the

younger Tipton to work for the Smiths as specified in the written contract, seem to be nothing more than adornments of the main controversy, and do not merit any separate discussion.

Upon another trial, if the evidence is substantially the same, the court will direct a verdict with respect to the tobacco, and will limit the liability of the Smiths as concerns the corn, in accordance with this opinion. The other issues of minor importance may be presented as upon the first trial.

The judgment is reversed, for proceedings in conformity with this opinion.